United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 96-3475

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Elbert Emmanuel Carlisle, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 21, 1997

Filed: July 9, 1997

_____

Before BOWMAN, WOLLMAN, and MORRIS SHEPPARD ARNOLD, Circuit
Judges.

_____

WOLLMAN, Circuit Judge.

Elbert Carlisle appeals from the judgment entered by the district court[1] following Carlisle's conviction of attempted robbery of a federally insured bank, in violation of 18 U.S.C. § 2113(a). We affirm.

_____

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

Carlisle met Kristina Gildseth at a bar in downtown Minneapolis in November of 1995. Carlisle learned that Gildseth was in need of money, and he intimated that he might be able to offer her a position cleaning his house. Gildseth began cleaning Carlisle's residence and shortly thereafter the two developed an intimate relationship.

Carlisle raised the subject of a bank robbery to Gildseth in early January of 1996. On January 10 or 11, Gildseth accompanied Carlisle as he drove to a First Bank branch in Minneapolis (First Bank). Carlisle informed Gildseth that it was the bank he wanted to "nail." According to Gildseth, Carlisle watched First Bank to "see people come and go" and described how he wanted the robbery to take place. Gildseth testified that this conversation was one of "many conversations concerning the bank robbery." The plan was that Gildseth would be the driver and would meet Carlisle at a Minneapolis cafe. From there she would drive Carlisle to the Minneapolis Greyhound bus station, where he would change clothes. The two would then proceed to First Bank.

Carlisle had Gildseth purchase a length of pipe, which he then used to construct a fake bomb. Three days before Carlisle's arrest, Carlisle dictated, and Gildseth printed, a demand note:

> This is a robbery for $50,000. I have a bomb that will take out this bank and ½ the block by remote control. I can hear Police calls on my radio, so No <u>silent</u> <u>alarms</u> and No <u>dye</u> <u>money</u>.

On January 16, Carlisle informed Gildseth that he wanted to rob First Bank the following day. That evening, Gildseth informed the Minneapolis Police, and subsequently the Federal Bureau of Investigation (FBI), of Carlisle's plan.

Minneapolis police officers and FBI agents went to the designated cafe the morning of January 17. Carlisle entered the cafe at approximately 8:00 a.m. and proceeded to drink coffee, a police scanner on the table beside him. When Gildseth

failed to arrive, Carlisle called her, leaving a message on her answering machine that he was waiting for her. Carlisle left the cafe at approximately 10:15 a.m. and was arrested as he entered his car. Carlisle was wearing eleven layers of clothing at the time.

A search of Carlisle's vehicle revealed a knapsack in the trunk containing a hunting knife, a dark blue ski mask, sunglasses, several bank deposit envelopes, a fake bomb, a remote control device, and the demand note. Investigators recovered the police scanner and a manual for the scanner, a book of radio frequencies, and a gym bag containing a toy gun from the back seat of the car. The credit card used to purchase the scanner, and the receipt for the scanner showing that it had been purchased approximately a week earlier, were also found in the car.

At trial, Carlisle contended that it was Gildseth, not he, who was interested in performing a robbery and that she had urged him to rob the bank and had helped plan the robbery. Carlisle claimed that his involvement was merely a "charade" to enable him to continue his relationship with Gildseth. Apparently unpersuaded by this account of events, the jury convicted Carlisle, and he was sentenced to 210 months' imprisonment.

Carlisle contends that the district court erred in denying his motion for judgment of acquittal, arguing that the evidence was insufficient to establish that he took a substantial step in furtherance of the robbery or to establish that the bank was insured by the Federal Deposit Insurance Corporation (FDIC). In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the government and give the government the benefit of all reasonable inferences. See United States v. Bordeaux, 84 F.3d 1544, 1547 (8th Cir. 1996). We will overturn the jury's verdict "only if a reasonable jury must have had a reasonable doubt" that the elements of the crime were established. Id.

To support the conviction of attempted robbery, the evidence must prove both that Carlisle intended to engage in criminal activity and that his conduct amounted to a "substantial step" towards the commission of the crime "which strongly corroborates the actor's criminal intent." United States v. Crawford, 837 F.2d 339, 340 (8th Cir. 1988) (per curiam). A substantial step is conduct such that if it had not been extraneously interrupted would have resulted in a crime. See id.

In Crawford, the defendant recruited an accomplice to provide a getaway car, coveralls, ski masks, gloves, and a weapon, and he and the accomplice cased the target bank. 837 F.2d at 339. He also instructed the accomplice to leave in a church parking lot a car which the defendant could use to drive to the bank. Id. The defendant was arrested when he arrived at the church parking lot and started the car that had been left by the accomplice-turned-informant. Id. We found that this conduct was "directly aimed at the commission of a bank robbery" and strongly corroborated the defendant's intent, and that the robbery was interrupted only because of actions of police officers rather than the defendant. We thus held that the evidence sufficiently established that the defendant had taken a substantial step in furtherance of the robbery. See id. at 340.

Carlisle's conduct was more extensive and elaborate than the conduct in Crawford. Carlisle recruited Gildseth, cased the bank, described the plan to Gildseth, acquired equipment to use in the robbery, constructed a fake bomb, and purchased a police scanner a week prior to his arrest. He wore eleven layers of clothes to the cafe on the morning of January 17 and had in his car the toy gun, the demand note, sunglasses, a hat, and the fake bomb. He brought the police scanner, which he had tuned to police channels, into the cafe. This evidence would allow (if indeed not compel) a reasonable jury to conclude that Carlisle had taken acts aimed directly at the commission of a bank robbery that went beyond mere preparation, strongly corroborated his criminal intent, and constituted conduct such that if it had not been extraneously interrupted would have resulted in the commission of a crime.

Accordingly, the jury's finding that Carlisle had taken a substantial step in furtherance of the robbery was supported by sufficient evidence.

Carlisle next argues that the evidence failed to establish that the bank was insured at the time of the robbery. Whether the bank to be robbed was insured by the FDIC "is an essential element of the case and therefore must be established." Scruggs v. United States, 450 F.2d 359, 361 (8th Cir. 1971). The only evidence of insured status introduced at trial was a stipulation "that First Bank at 2546 Hennepin Avenue South in Minneapolis is insured by the Federal Deposit Insurance Corporation." The stipulation did not mention First Bank's insured status at the time of the robbery. Because Carlisle did not object to this alleged error either in his motion for acquittal or at any other point during trial (we note that Carlisle's counsel on appeal did not represent him at trial), we review for plain error. See United States v. McCaghren, 666 F.2d 1227, 1232 (8th Cir. 1981). Such error must be plain, must affect the defendant's substantial rights, and must seriously affect the fairness or integrity of the trial. See United States v. Olano, 507 U.S. 725, 732 (1993).

However poorly worded the stipulation, we conclude that it did not result in plain error. Viewing the evidence in the light most favorable to the government and conferring upon the government the benefit of all reasonable inferences, see Bordeaux, 84 F.3d at 1547, the evidence provided a basis upon which the jury could conclude that the bank was federally insured, for the jury could reasonably have inferred from the fact that the bank was insured at the time of trial that it was likewise insured at the time of the robbery. See United States v. Hadamek, 28 F.3d 827, 828 (8th Cir. 1994) (bank officer's testimony that bank deposits "are" insured allowed jury to infer that bank was FDIC insured at the time bank fraud occurred); United States v. Cook, 320 F.2d 258, 259-60 (5th Cir. 1963) (applying evidentiary rule that existence of a fact is some indication of its probable existence at an earlier time). The fact that the stipulation was dated only some four months after the robbery reinforces the reasonableness of such an inference. See United States v. Rangel, 728 F.2d 675, 676 (5th Cir. 1984); United

States v. Knop, 701 F.2d 670, 672-73 (7th Cir. 1983); United States v. Safly, 408 F.2d 603, 605 (4th Cir. 1969).

We have considered Carlisle's remaining contentions, and we conclude that they do not merit discussion.

The judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.